Thank you, and may it please the Court. Aaron Hewitt for Appellant David Lee Womack. I'd like to reserve two minutes of my time for rebuttal. This is an appeal of summary judgment granted to the defendants on Womack's Eighth Amendment claim for being shackled and restrained for 26 days straight. I mentioned in my brief, but I think it's key to understand a little bit of the procedural history in that the District Court granted a stay of discovery to the defendants based on their qualified immunity and on their exhaustion of administrative remedies defense prior to my being able to complete discovery and being able to file my opposition to summary judgment. And the Court then ruled on the merits of the Eighth Amendment claim and the exhaustion defense without discussing qualified immunity whatsoever. Now the defense, I think that's key in understanding one of the reasons why genuine issues remain in this case. Well, I was going to ask you about some of the issues. You make a statement in your brief, and depending on what the underlying undisputed facts really are, may be the ultimate master of understatement. You say, while Appellant engaged in occasional disruptive behavior to protest his shackling. In the red brief, and I think maybe I'm wrong here, it's one of these disappointing cases where you read one set of briefs and you have one opinion of what happened and then read another set of briefs and you have a very different idea of what happened. They say that the defendant was for several days telling the staff, eat, I'll change some of the nouns here, eat excrement. If I get a chance, you're getting a face full of excrement. Refused to, staffers offered to take him out of restraints so that he could clean his cell. Appellant actually refused to take him out of restraints. All these are cited to the record, so I assume that they're not contested, and I assume this is what is subsumed in your concession, that there are occasional instances of disruptive behavior. The next day, he spread excrement throughout his cell. December 30th, staff noted him preaching his door, making demands for a radio and new headphones, some porn magazines, and stating, I'll wear these chains for 50 days before I go back to a regular cell without a radio. They then say he was taken out of his cell so the cell could be cleaned on December 31. Staff tried to check his wounds. He refused to let them. Told the staff, eat excrement. If I get a chance, you're getting a face full of excrement. January 3, after he agreed to conform to VOP rules, Smith, the warden, ordered that the restraints be removed. I assume that, and I've just kind of picked out some of the juicier, if you will, no pun intended, excerpts from the red briefs. I assume that's what is meant by he engaged in occasional disruptive behavior, but it appears from the red briefs that at times he was actually threatening that they better not take the shackles off him because they were going to get a face full of it if, and he wasn't just talking about abuse of language, if they did take the shackles off, how in the world can we find deliberate indifference on this record? There's another issue of our notice which we can get to. That may be the real kernel of the issue here. How can we find deliberate indifference on the face of this? Well, I agree that the defendants paint this guy out to be an animal, but I think, but genuine issues remain regarding the reasonability of the use of force and the reasonability of the harm that they caused on Mr. Wolf. Well, wasn't he threatening, saying basically, I'll paraphrase it, you better not take these shackles off or you're going to get it? And one time he told them, don't take the, I guess that was on, was that January or December 31 he told them, you don't take the shackles off, December 30. I will wear these chains for 50 days before I go back to a regular cell without a radio. I'm wearing these chains for the people of Africa. And I would submit that he was at that point in restraints continuously night and day for over 20 days. And if you back up a little bit, the record also shows through defendants' own documents that Mr. Womack was restrained for hours on end, for at least eight hours on December 31. I don't think they're denying any of that. The issue is whether or not on the face of it as a matter of law, given these allegations and what they concede to, what they concede to are your allegations, whether we can find deliberate indifference with a person who I think even in one of the instances he asked that the restraints be put on him. Now I'm not sure if that's assumed within these 26 days or an order period, because he was concerned about hurting himself. He had an incident which I assume the staff knew about trying to swallow a spoon to commit suicide. So we have not only somebody who is violent and threatening and destructive, but someone who has a history of hurting himself if not put in restraints, has asked to be restrained. And we have to find that restraining him for 26 days, during a period of which they checked his shackles when he permitted them to. And I understand your cite to the case law that says checking shackles and restraints in and of itself is not enough. And that makes sense, and that's logical. You can't cover your abusive behavior by going in and checking your shackles. If it's improper force, it's improper force. And it may go with deliberate indifference, but you don't get a pass on deliberate indifference because you checked the shackles. But on this record, how can we get, what is your best argument on deliberate indifference besides the fact that they left him in shackles for 26 days? What beyond that, in this case, allows us to find that? Well, two things. Not only can Mr. Womack show through the defendant's own records that he was held in restraints for hours on end. They conceded that. I'm sorry? They conceded that. And so I would say that they're not restraining him with any penological justification. And the second reason is the point that I made earlier, which is that the discovery in this matter is one-sided. We've been denied the ability to ask any of their witnesses any questions. And I think because of that, that's a critical aspect in understanding where this case is procedurally. The lower court did not address whether the defendants were entitled to qualified immunity. Rather, it saw fit in addressing the deliberate indifference issue, albeit in a footnote, on the very last page of the opinion. And so I just think that it highlights that genuine issue. Is your main argument here the abuse of discovery? Because that's not what mediates to your brief. I'm sorry? Is your main argument here the denial of discovery, the abuse of, not abuse on their side, but you being denied discovery? It's not the main issue in our brief, but we do address that issue in the brief. In particular, we refer to it while we're in the course of our argument on the Eighth Amendment issue, saying the court points to X, Y, and Z as reasons why we couldn't show deliberate indifference, but we haven't been able to even conduct discovery yet. And so the other critical issue here is determining whether genuine issues remain regarding the exhaustion defense that the defendants would like to use. Now, Womack has shown that he did not know, nor should he have known, what the appropriate procedures were in terms of exhaustion defense. Based on his illiteracy. Based on his... You don't deny he got the book. Well, at this point, the record has been supplemented, and the record goes... Even before the supplement that came in yesterday, wasn't it conceded that he got the manual? Yes. And it's also conceded that in the manual was a description of the administrative remedies, the time limits, correct? Yes. So your argument comes down to the fact that because he was illiterate, he could not possibly have read it, and therefore, using a subjective rather than objective test, he could not have known that he had those rights. Well, I think the point is that, right, he was illiterate. Isn't that the core of your argument? That he was illiterate. Well, just say yes, that's the core of your argument. That's right. If it is the core of your argument. Yeah, that is. And the idea is that, look, he can't be held to have known... What if he wrote the case ten years later? Would that have been okay then? Or 15 years later? Or eight years later? Or two years later? And this brings me back around to the evidence that was submitted yesterday, which shows that it's not only a... We're actually able to look at the handbook now in question, and even if the remedies were available to him, there's not what the defense has represented to me all along in this case, in that it was a 20-day rule hard stop, but that it was a 20-day rule unless it wasn't feasible. I didn't know of this exception at all until a week ago when defense brought this handbook and produced it to me. Now, that raises other issues because it gives new light to the warden's addressing his grievance on the merits when he received his complaint. He was only a matter of a few days late in terms of the 20-day rule. It wasn't two days. It was a month. Maybe it was a month. A month and a half or something. It was a little more than a few days. But the warden made a determination that he was willing to consider the merits and he had enough of what he needed to know, and therefore he should... That response, to me, looks like he determined under the handbook's rules that he said, well, okay, maybe it wasn't feasible, but I still know what I need to know, and I'm going to rule. Is that a waiver argument? It could be a waiver argument. But if you think about it also, the argument we've been making all along is a waiver argument because, look, they're trying to avail themselves of this defense. And we're saying, well, because the remedies weren't available to him, they, in essence, waived that argument. The idea is, look, when the warden addressed the issues on the merits and my opposing counsel says, and he consistently has argued this, he addressed them for informational purposes only, but he says he addressed them for informational purposes only because no remedy was asked for. In addition, he said... I'm sorry, because what? Because Mr. Womack did not ask for a specific remedy. But he said, and on top of that, if you're unsatisfied with his response, you may, you have 20 days to appeal it. You can go to the regional office and you have 20 days. And Mr. Womack met those deadlines all the way up until we got here today. But it's your position that if somebody goes, let's assume he was a University of Pennsylvania graduate, so he knew, fully knew his remedies, fully knew he had 20 days, but he waits a month, waits two months. Well, one doesn't follow from the other. Well, I'm assuming literacy. That he, you know, he knew what his remedies were. But he goes, for whatever reason, he goes two months late. But the warden, instead of saying, I won't consider this because it's late, considers it. You're saying that in that case, the availability of the exhaustion defense is gone. That a prison official who hears an out-of-time administrative complaint, assuming it's knowledgeable and we're not having the problems we have here, waives any later defense on appeal that the complaint was late. Yeah, and I actually think the... You think that's good policy? Do you want to do that? And I think the cases that this circuit court have decided that are directly pertinent to this argument are Spruill v. Gillis in particular. Because in Spruill, there was a procedural default issue, whether the inmate had named specifically the people that he wanted to file federal litigation against later on. And now in that case, this court held that because the warden addressed on the merits, and also the warden addressed the specific person, even though he wasn't named in the grievance, that person was on notice that his conduct was being complained of.  And there was no procedural defect. We have a very similar situation here. We're not talking about a time rule. We're talking about a procedural issue that you need to actually name the people. But the same principle applies. And I suppose the warden might well have made such a determination, given that he was in isolation this whole time. That's right. And he was illiterate, and he didn't have a cellmate until two days or so before he filed it. That's right. But what is the rule? You said you have recently discovered that the rule is not a 20-day rule, but it's a 20-day when feasible rule? Yes. When did you find this out? A week ago, when the defense sent me an email attaching the handbook that they alleged they gave him. And it says, like I said, 20-day rule, unless it's not feasible. This was totally new to me. And it's part of the general problem in this case, where the discovery is one-sided. And I haven't been able to ask anyone at the prison about what their rules are and what we were looking at, in addition to the deliberate indifference problems. Okay. I think I understand your position. It is true that your client was aware of the existence of a grievance procedure. He had grieved things before. In general. In general, but not of the 20-day rule. That there is a genuine issue as to that. Okay. Thank you. Thank you. Good morning, Your Honors. Michael Baldwin on behalf of the federal prison officials, the appellees in this matter. I just wanted to quickly address my colleague's statement about the discovery issue. In the district court, there was no motion for a Rule 56F request for additional information. The stay was for depositions. And qualified immunity, that's an appropriate defense and it's an appropriate protective order. We provided, though, a lot of written discovery. Boxes and boxes of written discovery that weren't asked for. We copied those. I'm sorry, that weren't asked for. That weren't asked for. We provided his central file, his medical file, and we shipped it off. They had enough information to address the exhaustion argument. Well, the exhaustion, but deliberate indifference. It seems to me they can't make out a case here without talking to the corrections officers involved. Or some of the medical people who may be involved. Unless they can ask specific questions, they can't establish deliberate indifference. I would assume there's nothing in those. Well, there may be something in the files that would give them that. But the heart of the case would seem to me would come from testimony of the corrections officers and the medical personnel and the administrative personnel and the institution. Well, Your Honor, one, they didn't specify here or at the district court what actual information would be required to oppose deliberate indifference standards. The district court looked at the admissions of Mr. Womack. He admitted to a lot of things, and the court looked at those admissions and determined that that was enough to show that the prison officials used reasonable judgment in their penological interest to make sure that this inmate did harm himself, harm others, and make sure that the institution was still in good order. As to the exhaustion argument, my colleague has stated that he was unaware of this exception to the 20-day rule. Where is it? I saw it this morning. It came in yesterday morning. Where in the material is it sent in the handbook? Does it say one, 20 days, and then secondly, where appropriate or where feasible? In the handbook is an outline of the... The problem resolution is officially called cop-out? I love that. That's the name given to the inmate request to staff member. Commonly called a cop-out. Okay, so using the vernacular. On page 9 of the inmate orientation handbook, and this is what my colleague actually called me about this. I think it was this week or last week. It states, there's a one-sentence paragraph. It says the BP-9 complaint must be filed within 20 days from the date on which the basis for the incident or complaint occurred, unless it was not feasible to file within that period of time. That is coming from 28 CFR section 542.14B. My colleague cited through section 542.14A, the next subsection provides the exception. And that exception is in the warden's discretion if the inmate has an excuse. If he was in transit or some other reason. Mr. Wormack didn't raise an issue in his administrative remedies. He continued to just state that he was in shackles. He never said, I'm illiterate. I can't get a – no one can fill out my forms. The prison is hampering my ability to file administrative remedies. He let it go forward. And so the institution – But it was moving forward. The warden did let it go forward. Yeah, it was moving forward. This man's coming to us from solitary. He obviously knew that. Why do you think he said, I'm going to address this on the merits? Well, he didn't say he was addressing it on the merits, Your Honor. He said he addressed the issue because the prison system is all about resolving grievances. We have inmates and prison correctional officers, and the administrative remedies are set up for twofold. One, to make sure that they exhaust so they can get into the federal courts. But two, so that we can informally resolve these grievances. The first filing was a BP-8. Now, the BP-8 was a filing to Mr. Wormack-Fodge, who's the unit's counselor. He said he was in 26 days of shackles, but that was all he said. And then his next grievance was the BP-9. The warden was just resolving a grievance, but he wasn't making a determination that this was a meritorious appeal, that he filed it within 20 days. I didn't suggest he was saying it was a meritorious appeal, but he considered something you say. Clearly, he had no jurisdiction because it was out of time. Well, the governing rule here is to file within 20 days or later if it's feasible, when it's feasible. Now, assuming the warden didn't make a decision about this, despite the fact that he went ahead and decided the case, can we throw this case out on lack of accessibility, or I'm sorry, on failure to exhaust, when there is a material dispute of fact as to whether it was feasible for him, in solitary, being illiterate, being guarded by people who were involved in the matter that he was complaining about, couldn't a reasonable fact finder find that it was not feasible to file until he did, get out of solitary and get a cellmate? I think I understand your question. I think, if I could break it down, Your Honor, the first is being illiterate. The courts have found in the Sixth, Seventh, and the Tenth Circuit that that's not an excuse. There's no duty to, well, they didn't address that particularly, but the Sixth, Seventh, and Tenth Circuit said there's no duty to notify. In fact, the Seventh Circuit in Twitty, albeit an unpublished opinion, stated that it's the prisoner's obligation to find himself, to make himself aware of those remedies. The prisoner has some obligation. In his declaration, you'll see on page 386, paragraph 20, he states that he's aware of the grievance procedure. That doesn't help. To say he's aware of the grievance procedure doesn't mean that he specifically understands the 20-ish days that he has to file under, if he's going to file BP-9. I agree with you, Your Honor. However, the prisoner has some obligation. Once he has that knowledge, he has to take that step. What knowledge? The knowledge that there is a grievance procedure. He should take a step to make himself aware that there's 20 days. There's inmates filing these grievances around him. He can ask an inmate. He can ask a correctional officer. Under 542.16, if an inmate's illiterate, the warden will assist him, will give him an accommodation. He didn't ask for that. The second thing, Your Honor, is you said that the – is there an issue of fact that he could not trust the prison officials. There's no futility exception with administrative remedies. Even if he believes that it will be – that he won't make out in his administrative remedies, he still has to follow them. He still has to ask the prison officials and has to follow those administrative remedies. So I don't think there is an issue of fact. Well, the question was not about whether he has to follow the administrative remedies. The issue is whether or not there is a material dispute of fact as to whether he did follow the procedures because the procedure was 20 days unless that's not feasible. And you're talking about a person who was in solitary confinement, et cetera, et cetera, and who filed as soon as he got out of solitary confinement and got a cellmate to draft a thing for him. Isn't there at least a material dispute of fact as to whether he timely filed? Not whether he's excused for not timely filing, but whether he timely filed. Your Honor, under 28 CFR 542, subsection B, he has to establish – he has to state in his administrative remedies that he couldn't do it for a particular reason and give that warden the discretion to determine whether or not that administrative remedy should go forward. He didn't do it. The warden let it go forward. He let it go forward. The warden stated for informational purposes. The central office and the regional office all said he was 20 days. There's no waiver of a defense in the institutional level. The warden made a determination for informational purposes. And then it went up. Mr. Womack had the opportunity to move for extension of time. He could have said, I need a time. I'm illiterate. I'm in Sioux. Someone's not giving me forms. He's not saying that. In his administrative remedies, there's no request for extension of time. There's not even a statement that he's illiterate. In fact, the first time we find out he's illiterate is at the district court level. The first time we find out that he needed an extension of time is at the district court level. The first time I find out that he needs an extension – he's making an argument that we waive is at the appellate level. We heard nothing about this in the district court level. We heard nothing about this in the administrative level. Can I ask a technical question? In JA-484, what you gave us, what the supplemental appendix was, there is a list of program contents phase, and there's a line that says, date, lecture, discussion given. And then there's a number 24 is administrative remedy program, and it says on 8-2203, lecture given. You take the position that, in fact, the administrative remedy was, in fact, explained to him either in a lecture or a discussion? Yes, Your Honor. Unfortunately, I didn't have this at the district court level, but I provided this. This was provided to Mr. Womack during discovery. He had a copy of it. He had more copies of documents than I did. So we weren't aware that he'd signed this, but the institution takes that step. Although the Bureau of Prisons – You didn't know that up to now that, in fact, you have an argument that he was explained what the remedy was. Absolutely, Your Honor. The Bureau of Prisons, not only did they provide him a handbook, but a counselor went over his administrative remedies with him. I think my colleague's argument to that would be that there's no checkmark that he heard the 20-day provision or he didn't hear that he could get an extension of time. Well, now let me ask you just one more question that I asked before. If an administrator accepts beyond the 20 days, accepts it and deals with it, in other words, makes a finding with respect to the charge or to the complaint, does that constitute a waiver for later on, a waiver of the ability of the government to argue, the Bureau of Prisons to argue, that, ah, you didn't meet the 20 days? No. In another context, certainly in a court, I mean, for those times, like if you – one side can waive. That's normally a waivable kind of restriction. It's not jurisdictional. I mean, it's waivable. But here the act of waiver would be from the administrator, the warden, or whoever the first level decider is. Your Honor, we don't think so because – Is that briefed? Is that issue briefed at all? No, this is the first time we've heard it today. Although opposing counsel said that I provided this issue to him this week, I think that issue was raised in – that document, that administrative remedy response, was in his brief. Oh, yeah, that was known. It's been known from day one. It's known from day one. So his argument that we've waived it, we haven't – that's never been briefed. That's the first time we've heard about it today. But I'm not sure that what we're really talking about here is a waiver. I mean, we're talking about a doctrine of exhausting administrative remedies. Yes, Your Honor. He exhausted all the administrative remedies that were available to him. If he had filed timely, the warden would have made the same decision that he made, exactly the same decision, and he would have exhausted his administrative remedies. If he didn't file timely, he did exhaust because the only – that the warden said, no, I'm not going to give you relief for this reason. Your Honor, the warden wasn't able to issue whether or not relief would be granted because, as he states in his response, there was no remedy requested. So there was no judging on the merits. There was no, you can receive this relief. You will be out of shackles. You can get certain time back. There was no remedy requested. All the – if you read the response, all the warden is saying is explaining why he was in the restraint. There's no remedy that he's providing or denying. And so that – although that argument wasn't raised – He could give the remedy of making a finding that the restraint was wrongful, and that would certainly make his record better. I mean, there would be some benefit to the prisoner if the warden said, you know, we thought about it, and you really shouldn't have been in shackles. That was a mistake on our part. There isn't. That would offer him some benefit, wouldn't it? Well, I don't know. I don't know what they would raise and how they would use that because he's 20 days late. The two – Don't keep going back to the 20 days. Well, the central office and the regional office all said he was late. And so as – Did they have any information about whether or not it was feasible to comply with the – did they make any inquiry or did they just say, ah, 20 days, he's late? As I stated earlier, I believe that it's the prisoner's obligation. I think it's the prisoner's obligation to say, I had a reason why I was late. The prison can't guess why he was late, why he was – if he had an excuse that he was late. So they knew he was in solitary, right? But in solitary he's entitled to get forms. In his – He's entitled to get a lot of things. It doesn't mean he gets them. It's a prison. If you see in his declaration, actually his declaration on page 387, and I think it's in paragraph 21, he says that he didn't trust the prison to fill out his grievance form. So he concedes that the prisoner – that the prison officials would fill out his grievance, but he just didn't want to do it. No, he's not saying that at all. He's saying, I'm not sure they would or not. I don't trust them to do it. He's not saying, well, I trust them to do it, but I'm going to do it myself. That's not at all what he's saying. He's saying exactly that, but he's saying, I don't trust them to do it. That's not saying that he concedes that he – that they would do it. And go back to Judge Staple, isn't there at least a dispute of fact on that? Let's look at it from that point of view. Not – we'll decide that. Isn't there a dispute of fact as to whether it was available within the 20-day period? Just a dispute of fact, not – It's not that we necessarily would decide one way or the other, but there's a dispute from which a fact finder could determine that, you know, under the circumstances, he did act promptly when it became available, when he was able to do it. I see my time is up. May I answer? I think – well, yes. Yes, yeah, yeah. There is a procedural default requirement. If you procedurally default on your administrative remedies, that's the law in this circuit. If you procedurally default, then you do not – But you're not answering the question. We know all that. Believe me, we spend a lot more time on procedural default issues than any of us want to spend. That's right. But the issue is whether or not, given that word feasible, doesn't that give rise to an issue of fact about whether or not in this particular case compliance with the 20 days was feasible? Regardless of whose burden it is or anything else, maybe that's what would resolve it. But just take all that aside. Just how can we conclude as a matter of law if we go off on this waiver issue? Well, I'll make it easier for you or maybe harder. I don't know. Even leaving illiteracy out, because I'm a little troubled by that. Let's assume – forget the illiteracy as a factor. But on all the other factors that Judge Stapleton mentioned, even leaving the illiteracy aside, the argument that he's illiterate, therefore he couldn't be. Isn't there really a dispute of fact here as to whether this was reasonably, really available to him within the 20-day period? Even leaving the illiteracy issue out. I don't know if that argument was made by my colleague. I think what his argument was is that he couldn't do it because he was illiterate. He doesn't make an argument that he could do it because he was in a shoe. There's no argument that because he was in a shoe, he couldn't do it. The argument is made that because I'm illiterate, I didn't know the procedures and I couldn't follow it in the shoe. There's no argument that I was in the shoe, and therefore I couldn't do it. I know other inmates have made that argument, but this inmate hasn't done that. This inmate has said, because I'm illiterate, I cannot avail myself of the administrative remedies. Thank you very much, Mr. Arthur. Thank you, Your Honor. Mr. Hewitt, do you wish to have some time? Thank you. I'd like to address some of the issues that my colleague had raised and also to address one of the issues that Judge Stapleton raised, which is he's not sure whether this is a waiver issue. To me, I think that's right because under the handbook rules that I just got made aware of, there is a question of fact as to whether he satisfied that second prong, and so he would have properly exhausted. It's a proper exhaustion type of issue. We had asked for these documents. My opposing counsel said we did not ask for these. We did not ask for them in official document request. We asked him for his file, and he gave it to us, and he represented that's what it was in. That's what his file was, and it was done. He also raised the point as to what was in the regulations versus what was in the handbook. I don't think that's an issue at all here because I have certainly known what has been in the regulations all along here. What I didn't know is what was in the handbook, and if Mr. Womack is to be held to what was he required to exhaust, it should be in the handbook because that's, according to his own argument, to opposing counsel's own argument, that's what was made available to him. They didn't make the regulations available to him, so he can't be held to exhaust those. Did you ask for the rules and regulations that had the 20-day limit actually in it? I had access to them myself. They're on the internet of the DOP website. This handbook from Lewisburg? That's not what I'm referring to, no. The BP regulations are what my opposing counsel was referring to and what I'm referring to when I say the regulations. If available or feasible is in the Lewisburg handbook.  Right. Did you ask for that handbook? We asked for all the documents that were relevant to this. We're having a hard time getting answers. Sorry. Did you ask for the handbook? Now, if there's something, as I said to my daughter, if there's something in that sentence you don't understand, let me know, but assuming you understand the sentence, could you answer that question? We actually did issue written discovery after they provided us the… So the short answer is yes, we asked for the handbook. True. That would answer the argument that you never raised the issue about the feasibility. You didn't know that was in there. So I'm just curious as to when you understood that it wasn't an absolute 20-day limit, but a 20-day limit with a modification. And you're saying you didn't really know that until you saw the Lewisburg handbook a week ago. That's right. Or two weeks ago, whenever it is you first saw it. And therefore, you couldn't have raised that. You would argue you couldn't have raised that issue if you didn't know about it. Right. But like I said in the very beginning, we asked for it. The court granted a stay based on qualified immunity and exhaustion, so we haven't been able to ask anyone at the prison what their rules were. So again, that's another reason why genuine issues still remain in this case. This is not on the Internet, this ANO handbook? That's not on the Internet. Each institution has their own unique handbook. It's not generated by U.S. Bureau of Prisons? I don't know for sure, but I actually did look on the Internet myself and I found one out of a prison out on the West Coast. Is there a CFR that gives the 20 days? Yeah, exactly. Those are the regulations that Opposing Counsel was referring to. They say the 20 days, and then they say the next section says… The word if feasible… No, if feasible is not in there at all. It's handed by the Lewisburg handbook, but it isn't in the CFR. That's right. Or maybe handed by the Bureau of Prisons. It may be unique to all prisons you don't know. Absolutely. It doesn't say anything about whether it's under the warden's discretion to excuse for timeliness or what. A few other points. Today is Tuesday. We'd be glad to go for a little bit already. Rather than making a few other points, why don't we just recognize the red light is on. Thank you very much. All right. Thank you. Thank you. That is Tore Brothers v. Century Surety Company.